UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

SCOTT W. SKYLSTAD,

                Plaintiff,

    vs.

JASON REYNOLDS, THOMAS
STANTON, DAVE McCABE, KURT
VIGESSA, DAN LESSER, BRENT
AUSTIN, LYNETTE LONGSHORE,
CITY OF SPOKANE; DAN
VELOSKI, LINDA DAVIS, RYAN
McELROY, R.N. HOFFMAN, M.D.
ROSE, SPOKANE COUNTY; M.D.
MICHAEL CARLSON, M.D. SCOTT
REDMAN, M.D. MARGARET
HADDON, M.D. STEVEN
BEYERSDORF, DEACONESS
MEDICAL CENTER,

                Defendants.

NO.   CV-03-5104-LRS

ORDER GRANTING CITY OF SPOKANE
DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT; DENYING PLAINTIFF'S
CROSS MOTION FOR SUMMARY JUDGMENT

    The City of Spokane defendants[1] have moved for dismissal or in the alternative summary judgment dismissing the claims of pro se plaintiff Scott Skylstad in this action commenced pursuant to 42 U.S.C. § 1983. Liberally construed, Skylstad's Amended Complaint principally charges that members of the Spokane Police Department (the "SPD" or the

---

    [1]The City of Spokane defendants are: The City of Spokane, Jason Reynolds, Thomas Stanton, Dave McCabe, Kurt Vigesaa, Dan Lesser, Brent Austin and Lynette Longshore

ORDER -1

"Department") violated his constitutional rights by subjecting him to excessive force involving the use of a police dog during his arrest.  In response to the defendants' motion, the plaintiff has filed a cross-motion for summary judgment.

**I. FACTUAL BACKGROUND**

   **A. Events Prior to Skylstad's September 2001 Arrest**

   On September 8, 2000, plaintiff, Scott Skylstad, while driving a Cadillac registered to Sandra Padrta, was pulled over by Spokane Police Officer Hendren due to erratic driving.  Skylstad was then arrested for possessing both a dangerous weapon and methamphetamine, and the Cadillac was impounded.  On April 19, 2001, Skylstad filed a civil rights complaint against several known city police officers, along with John Doe, in this judicial district.  *See Skylstad v. Collins, et al.*, No. 01-CS-124-LRS.  This lawsuit involved allegations that the methamphetamine found on his possession had been "planted" by the "John Doe" defendant, and that the Skylstad had been "forced" by a detective to work as a confidential informant to "work off" the drug charges. Skylstad now claims that the "John Doe" defendant in that case was SPD officer, and defendant, Jason Reynolds, and that the actions taken on September 19, 2001, were in retaliation for the filing of that lawsuit.

   Pursuant to the Prison Litigation Reform Act, Skylstad's lawsuit was dismissed *prior to service* by the Court on November 19, 2001, after Skylstad failed to amend his complaint as directed by the Court.[2]

_____

   [2] Skylstad claims his wife "served" his complaint upon Defendant Reynolds by taking it to the Spokane City/County Public Safety Building.  Defendant Reynolds had no knowledge of the existence of Case No. 01-CS-124 at the time of the events of September 19, 2001 and did not become aware of the lawsuit until the current claims were

ORDER ~2

On September 19, 2001, shortly around 9:00 p.m, Spokane County Sheriffs deputies were involved in a high speed pursuit of a green Nissan Altima in the Spokane Valley near Argonne Road and Liberty Avenue. There was only one occupant in the vehicle. During this pursuit, the driver of the vehicle drove in an extremely reckless manner, running red lights and stop signs, traveling at speeds up to 70 mph in a 25 mph zone, swerving severely right and left, driving into oncoming traffic, hitting a bicyclist at an intersection without stopping, and forcing other vehicles off the road. The pursuit was terminated without having stopped the vehicle.

At 9:30 p.m. Spokane City police officer and defendant Kurt Vigesaa initiated a pursuit after noticing the same Nissan Altima, now within the Spokane city limits in the vicinity of Francis and Freya streets, traveling at an extremely high speed (60 mph in a 30 mph zone). *Affidavit of Kurt Vigesaa* at 2, *Affidavit of Dean Sprague*, Vigessa Report. Vigessa noticed the driver was the only occupant of the car and also realized it was the same vehicle that had been involved with the County earlier. Vigesaa advised radio of the situation. Sgt. McCabe, Vigesaa's supervisor, gave permission to institute a pursuit and also became involved in the pursuit. Eventually at least four city police officers (Vigesaa, McCabe, Officer Thomas Stanton, and Officer Daniel Lesser) followed the Altima 7-8 miles with sirens and lights activated, through town and into the County, with permission of SPD Lt. Dean Sprague. The vehicle was swerving violently back and forth, and "blowing" through stop signs, forcing other vehicles off the road and

filed in December 2003.
ORDER -3

nearly causing a collision. Attempts to deploy spike strips were unsuccessful. This pursuit was terminated by order of Lt. Sprague as the car drove into a residential neighborhood near Park and Liberty Avenue, near where the first pursuit had also occurred, and also near where Skylstad lived. Officers pulled off the side of the road and turned off all emergency equipment. They saw the vehicle continue North on Park, and then lost sight of the vehicle.

**B. Skylstad's Arrest**

**1. The Stop**

*Defendant's Version:*

Several marked city police vehicles were now in the area. After having stopped chasing the Altima, officers continued to search and watch for the vehicle. Defendants claim that moments/less than a minute after the City's pursuit was terminated Officer Lesser spotted the Altima speeding toward him, weaving across lanes of travel. Lesser had to quickly pull over to avoid being struck. Lesser notified radio that the Altima appeared to be deliberately heading toward other officers who had pulled over. Sgt. McCabe ordered the pursuit reinitiated. Officers followed the Altima several blocks as it sped through the neighborhood at speeds of 50-60 mph in a 25 mph zone. At the intersection of Coleman and Liberty, the car had slowed, and Officer Vigesaa maneuvered his patrol car next to the suspect and used a pursuit immobilization technique (PIT maneuver) to "tap" the vehicle, causing it to spin 180 degrees and stall. The driver restarted the engine, and officers Vigesaa and Lesser attempted to keep the Altima boxed in, as Skylstad attempted to break away by "revving" or "gunning" the engine and rocking back and forth, resulting in damage to the two patrol cars.

ORDER -4

*Plaintiff's Version:*

Skylstad claims Jason Kiss was the driver of the Altima which had eluded the County Sheriff and the City police previously.  Skylstad has at times both denied and admitted knowing Kiss had been eluding police. Skylstad claims Kiss called him after having parked the Altima in front of Skylstad's house, and asked Skylstad to move the vehicle down the street.  Skylstad claims he then drove the car westbound on Liberty, and turned around and drove back toward his house, toward where the police were.  He denies swerving in the direction of the patrol cars, he denies driving at speeds any higher than 30-35 miles per hour.  He also claims there was no pursuit.  Just out of the blue, the patrol vehicles "crashed" into him when he was already stopped.[3]  He also denies gunning/revving the engine.  Skylstad claims he was at that point pinned in the vehicle.

**2. The Arrest**

*Defendants' Version:*

Defendants claim Skylstad ignored repeated police commands to surrender, to put his hands up, or turn off the engine.  It appeared to officers as if he were searching through the interior of his car rather than surrendering, thus police became concerned he was searching for a weapon.  Officers broke out the passenger window to gain access. Defendants claim the vehicle was still running and Skylstad was flailing and reaching around in his vehicle.

---

[3] In support of this notion, plaintiff cites the on-scene report of Richard Willey, Attachment 44.  The report actually states however, that it is possible the plaintiff's vehicle was "stopped when the *second* patrol car struck it," not that the car was stopped when the maneuver began.

ORDER -5

Through out this time officers were yelling at Skylstad to "stop resisting," "quit fighting," and to turn off the engine and surrender. Officer Stanton, part of the K-9 unit of the Spokane Police Department, was present and assisted by his trained and experienced K-9, Dave. Dave was trained to perform a "bite and hold" technique. After the window was broke, Officer Stanton inserted Dave through the window, whereupon the dog made contact with the Skylstad's right forearm, as commanded. As the officers attempted to pull Skylstad through the window, the defendants claim Skylstad continued to resist, thrashing around violently, hitting and striking with his hands and feet, and kicking the dog.

Officer Vigesaa attempted to get to Skylstad through the windshield, but was able to gain access through the driver's side window. He began started pulling Skylstad from the car and onto the hood of the adjacent patrol car. The dog remain attached to his arm, not letting go of his original contact. The dog is trained to bite the suspect until commanded to stop. Officer Reynolds perceived the officers needed assistance and then delivered three "knee strikes" to Skylstad's right rib area. Reynolds then put his knee across the upper part of Skylstad's body. Skylstad continued to fight strenuously with officers, but was eventually taken to the ground. At this point, Stanton gave his dog the "release" command and the dog immediately let go. Defendants claim the duration of the bite was less than 45 seconds.

On the ground, Skylstad continued to struggle, screaming, kicking, and trying to bite as officers commanded him to stop fighting and attempted to handcuff him. Officers claim Skylstad exhibited abnormal extreme strength. Multiple officers continued struggling with Skylstad

ORDER -6

attempting to gain control.  Then Sgt. McCabe applied several bursts of oleoresin/capasin spray (pepper spray) in Skylstad's face, at which point the officers were able to restrain Skylstad with head and leg restraints.

Defendants' deny smashing Skylstad's head into any windshield.

*Plaintiff's Version:*

Skylstad claims that once pinned in between the vehicles, he attempted to voluntarily surrender to police by immediately raising his hands.  He denies struggling, or thrashing around violently, hitting and kicking the dog. He claims he did nothing "to justify fighting in any way."  Plaintiff's Statement of Fact No. 16.  Skylstad claims the dog was allowed to bite him several times.  He claims also that his head was smashed repeatedly into to two car windshields, breaking them both. Skylstad asserts Vigessa and Lesser punched him several times in the back of the head, Stanton beat him in the head with a flashlight, Brent Austin drove his knee into Skylstad's head causing his head to break Vigessa's patrol car windshield.  During the confrontation plaintiff alleges Defendant Reynolds grabbed plaintiff in a headlock and stated "It was only a matter of time before I got you Skylstad.  Now, I'm going to give you something to sue me about.  Let this be a reason not to fuck with the cops."  *Amended Complaint at 42.*  Plaintiff alleges Reynolds then held him by the head and neck, choking him, punching him several times, and smashing his head into the Nissan windshield, causing it to break.  All the while the K-9 continued to bite him.  On the ground, he claims officers tore off all of his clothes.  He also claims McCabe and Stanton cut his left forearm open with surgical scissors and took two samples of his blood so they could tamper it by placing methamphetamine

ORDER -7

in the samples. Skylstad claims he was in shock and "in and out of consciousness" while at Deaconess Medical Center.

Defendants deny these allegations.

As evidence in support of Skylstad's version of the struggle, Skylstad offers the declarations Traci Skylstad, Skylstad's wife, Jason Kiss, and Jeremy Standon, who was there to give Mr. Kiss a ride and claims his girlfriend was the registered owner of the Nissan.   All witnesses claim to have been viewing the incident from 2-4 houses away.

### 3. The Medical Evidence

Medics treated Skylstad at the scene.   The dog bite injury consisted of a 4-5 cm lacerations and a few punctures on the right arm. Police were concerned the Skylstad might suffer from Manic Exhaustive Syndrome as a result of his confessed methamphetamine use and long struggle.   Medics therefore took a core rectal temperature reading. Officers had to assist in restraining Skylstad while this was performed. The medic's report also indicates the Skylstad was "uncooperative to questioning and somewhat confused" and that Skylstad had stated he had used methamphetamine recently.

Skylstad was transported by ambulance to Deaconess Medical Center. Nurses and doctors treated the dog bite. It was noted that Skylstad had abrasions on his back and chest, consistent with a struggle.   The Spokane County jail receiving form also noted the Skylstad had "mini-cuts" to his forehead, nose, and right side of his head. There is no medical documentation of an open cut or incision in Skylstad's left forearm, though Skylstad has provided undated, unauthenticated  of his left forearm which shows a mark.

Nurse Shari Hayman assessed the Skylstad's condition and drew blood

ORDER -8

samples with Skylstad's consent.  Three tubes were used, each containing

a "white-powdery" substance, potassium oxalate sodium fluoride, which

acts as a preservative and prevents clotting of the blood before it is

tested.  *Hayman Affidavit* at 3.  The blood was then given to officer

Reynolds, who gave it to Officer Austin who entered two capsules of

blood into evidence for testing.  It is unknown where the third tube is.[4]

The toxicology report tested positive for .62 mg/l of methamphetamine in

Skylstad's blood.

### C. Procedural Background

Plaintiff's Amended Complaint asserts both federal and state causes

of action.  First he claims Lesser and Vigessa unlawfully arrested the

plaintiff in violation of the fourth and fourteenth amendments and state

tort law.  Second, he claims Lesser and Vigessa committed the torts of

assault or battery in performing the "PIT" maneuver to stop his vehicle.

Third, plaintiff claims the officers used excessive force in

effectuating the arrest and in using the K-9, performed an unlawful

search, and imparted cruel and unusual punishment under the eighth

amendment by cutting open plaintiffs' arm, and taking plaintiff's blood.

Finally, plaintiff alleges the City of Spokane is liable for the actions

of its employees.  Defendants have denied all of plaintiff's claims and

have filed a motion to dismiss or in the alternative for summary

judgment.  Plaintiff has cross-moved for summary judgment.

## II. SUMMARY JUDGMENT STANDARD

Under Fed.R.Civ.P. 56(c), summary judgment is authorized if no

---

[4] The Court previously ordered the City to make inquiry as to the
location of the blood sample and have it reserved throughout the
pendency of the litigation.

ORDER -9

genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party shows the absence of an issue of material fact, the non-moving party must go beyond the pleadings and designate specific facts showing a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548. A scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir.1989).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987). The court must view the inferences drawn from the facts in the light most favorable to the non-moving party. Thus, reasonable doubts about the existence of a factual issue should be resolved against the moving party. *Id.* at 630-31. However, when the non-moving party's claims are factually implausible, that party must come forward with more persuasive evidence than would otherwise be required. *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics Inc.*, 818 F.2d 1466, 1470 (9th Cir.1987), cert. denied, 484 U.S. 1006, 108 S.Ct. 698, 699, 98 L.Ed.2d 650 (1988). The Ninth Circuit has stated, "No longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *Id.* at 1468. Plaintiff must ultimately persuade the Court in opposing summary judgment that he will have sufficient admissible evidence to justify going to trial.

ORDER -10

In deciding a motion for summary judgment, the court resolves all ambiguities and draws all inferences in favor of the nonmoving party. However, "bald assertions" completely unsupported by evidence will not withstand a properly supported motion for summary judgment. *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir.1991). Nonetheless, if the claim "turns on which of two conflicting stories best captures what happened," the movant is not entitled to summary judgment. *Saucier v. Katz*, 533 U.S. 194, 216 (2001) (Ginsburg, J., concurring).

## III. DISCUSSION

## A. § 1915 - Frivolousness

The federal in forma pauperis statute, enacted in 1892 and presently codified as 28 U.S.C. § 1915, is designed to ensure that indigent litigants have meaningful access to the federal courts. *Adkins v. E.I. DuPont de Nemours & Co.*, 335 U.S. 331, 342-343, 69 S.Ct. 85, 90-91, 93 L.Ed. 43 (1948). Section 1915(a) allows a litigant to commence a civil or criminal action in federal court in forma pauperis by filing in good faith an affidavit stating, inter alia, that he is unable to pay the costs of the lawsuit. Congress recognized, however, that a litigant whose filing fees and court costs are assumed by the public, unlike a paying litigant, lacks an economic incentive to refrain from filing frivolous, malicious, or repetitive lawsuits. *Neitzke v. Williams*, 490 U.S. 319, 324, 109 S.Ct. 1827, 1831, 104 L.Ed.2d 338 (1989). To this end, § 1915(d) "accords judges not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless." *Id*. at 325.

ORDER -11

Dismissals on these grounds are often made sua sponte prior to the issuance of process, so as to spare prospective defendants the inconvenience and expense of answering such complaints. *See Franklin v. Murphy*, 745 F.2d 1221, 1226 (9th Cir. 1984).    However, an in forma pauperis complaint that passes initial screening may still be dismissed "for frivolousness or maliciousness at any time, before or after service of process and before or after the defendant's answer." *Green v. McKaskle*, 788 F.2d 1116, 1119 (5th Cir.1986) (citing 28 U.S.C. § 1915(d)).

Because Plaintiff's amended complaint alleged causes of action under recognized legal theories and provided supporting factual allegations, it passed the initial screening phase. However, in light of defendants' arguments and upon careful review of plaintiff's entire amended complaint, the court finds that several of plaintiff's claims are factually baseless and untenable according to well-settled law. Accordingly, the Court is not foreclosed from dismissing this action pursuant to § 1915(d) because plaintiff's complaint and amended complaint passed initial screening.

Reduced to simplest terms, frivolous suits are those without an arguable basis in law or fact. *Nietzke v. Williams*, 490 U.S. 319, 325 (1989). As the Courts of Appeals have recognized, § 1915(d)'s term "frivolous," when applied to a complaint, embraces not only the inarguable legal conclusion, but also the fanciful factual allegation. *Denton v. Hernandez*, 504 U.S. 25, 33, 112 S.Ct. 1728, 118 L.Ed.2d 340 (1992). Before dismissing a complaint, the district court should give a pro se plaintiff an opportunity to amend, unless it is absolutely clear the complaint's deficiencies cannot be cured by amendment. *Karim-Panahi*
ORDER -12

*v. Los Angeles Police Dept.*, 839 F.2d 621, 623 (9th Cir.1988). Nevertheless, because a § 1915(d) dismissal is not a dismissal on the merits, but rather an exercise of the court's discretion under the in forma pauperis statute, dismissal does not prejudice the filing of a paid complaint making the same allegations. *Denton*, 504 U.S. at 34.

### 1. **Retaliation/Civil Conspiracy**

Liberally construed, plaintiff's amended complaint and plaintiff's cross-motion for summary judgment allege the defendants engaged in a civil conspiracy to retaliate against him for the filing of the lawsuit in April 2001. Retaliation by a state actor for the exercise of a constitutional right is actionable under 42 U.S.C. § 1983, even if the act, when taken for different reasons, would have been proper. *See Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 283-84 (1977). Retaliation, though it is not expressly referred to in the Constitution, is actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). The plaintiff must establish both that the type of activity he was engaged in was protected by the First Amendment and that the protected conduct was a substantial or motivating factor for the alleged retaliatory acts. *Mt. Healthy City Bd. Of Educ.*, 429 U.S. at 285-87; *Soranno's Gasco, Inc. v. Morgan,* 874 F.2d 1310, 1314-16 (9th Cir. 1989) (inferring retaliatory motive from timing and nature of suspensions). Once a claim is presented, the burden shifts to the defendants to show, by a preponderance of the evidence, that they would have reached the same decision in the absence of the protected conduct, *Soranno's Gasco* 874 F.2d at 1315.

In this matter, the Court notes that plaintiff did not assert the

ORDER -13

theories retaliation or civil conspiracy in his amended complaint. However liberally construed, the only evidence offered in support plaintiff's theory of retaliation is the factual allegation that upon recognizing him, Defendant Reynolds stated, "Now I'm going to give you a reason to sue" and "let this be a lesson not to fuck with the cops." Plaintiff now claims it was "obvious" to him he was speaking of the pending lawsuit. Plaintiff's allegations have no basis in fact and are insufficient to state a claim for retaliation or civil conspiracy. *See generally Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). The April 2001 lawsuit was dismissed *prior to service*. In addition, Plaintiff makes no effort to demonstrate anyone other than *Reynolds* knew of it. Reynolds denies having had any knowledge of the April 2001 lawsuit until the present litigation was filed. In any case, the plaintiff can not demonstrate the lawsuit was the *substantial motivating* factor for any of the conduct of *any* of the defendants. Accordingly, the Court finds the claims for retaliation and civil conspiracy are frivolous, and that the complaint's deficiencies cannot be cured by amendment. Accordingly, the Court dismisses such claims *sua sponte*.

2. **Forcible Drawing of Blood / Evidence Tampering**

As part of plaintiff's theory of retaliation, plaintiff alleges that while on the scene, defendants McCabe and Reynolds used "surgical type" scissors to cut his *left* forearm and forcibly take samples of his blood. He also alleges that these defendants then altered these blood samples by inserting methamphetamine into it.

The Court views these claims with particular care and skepticism. These claims are supported solely by plaintiff's self-serving allegations, which notably *were omitted from his original complaint* and

ORDER -14

only later included in the amended complaint after plaintiff misinterpreted a surgical report.[5] Plaintiff's claim that the officers tampered with the blood sample is supported only by plaintiff's own deductions of fact based upon the toxicology test results and the unlocated third capsule of blood. These claims are wholly unsupported by any corroborating evidence, affidavits or other documentary evidence, and undermined by other credible and persuasive evidence that the plaintiff has deliberately concocted this theory. Surmise, conjecture and conclusory allegations are not enough to create a genuine issue of material fact. Plaintiff has failed to provide any affirmative indications that these allegations are anything other than fanciful. Accordingly, the Court finds plaintiff's contentions that officers McCabe and Reynolds forcibly drew his blood and tampered the blood sample are clearly baseless, cannot be cured by repleading, and must be dismissed under § 1915(d). *Denton v. Hernandez*, 504 U.S. 25, 112 S.Ct. 1728, 1733, 118 L.Ed.2d 340 (1992).

**B.    SECTION 1983 CLAIMS**

**1.    Qualified Immunity**

Defendants contend the doctrine of qualified immunity shields them

---

[5] When questioned about this claim during his deposition, plaintiff asserted that though he had independent recollection of the event, he did not think he had sufficient evidence to include it in his original complaint. Plaintiff admitted he included the allegation in his amended complaint after interpreting Dr. Beyersdorf's surgical report as indicating he had incisions when he arrived at the emergency room initially. The report states, "The larger laceration of these two lacerations was connected with an elliptical incision that debrided all of the superficial tissue." Clearly, plaintiff misread the report. The surgeon was describing what *he did* during the surgery on plaintiff's *right* arm, not his left arm, where the laceration from the dog bite was located. Dr. Carlson also confirmed in his deposition that there was no evidence of any surgical cut to plaintiff's forearm when he came into the emergency room.

ORDER –15

from plaintiff's § 1983 claims. Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity protects "all but the plainly incompetent or those who knowingly violated the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). "Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, [the official] should be made to hesitate...." *Harlow*, 457 U.S. at 819, 102 S.Ct. 2727. However, where an official acts in an area where "clearly established rights are not implicated, the public interest may be better served by action taken 'with independence and without fear of consequences.' " *Id*.

In *Saucier v. Katz*, *supra*, the Supreme Court clarified the several stage process for determining whether the qualified immunity defense applies. *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). *First*, the Court is to decide whether taken in the light most favorable to the party asserting the injury, the facts alleged show the officer's conduct violated a constitutional right. *Id*. If plaintiff fails to conclusively establish a constitutional violation, the inquiry ends and the state actors are immune from suit. *Next*, the Court must proceed to determine whether the constitutional right in question was "clearly established" such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. at 201-02, 121 S.Ct. 2151. If the right is not clearly established, the individual public officials are entitled to qualified immunity if a

ORDER -16

reasonable official could have believed that his or her conduct was lawful. *Thompson v. Souza*, 111 F.3d 694, 698 (9th Cir. 1997). To be clearly established, the law must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *see also Groh v. Ramirez*, 540 U.S. 551, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004).

Once these requirements are found to have been satisfied, the inquiry proceeds to another, closely related issue, that is, whether the officer made a reasonable mistake as to what the law requires. *Saucier* emphasized that the inquiry for qualified immunity eligibility is distinct from establishment of a constitutional violation of excessive force. As the Court explained, "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct...[i]f the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." *Saucier*, 533 U.S. at 205, 121 S.Ct. 2151.

"[W]hether an official protected by qualified immunity may be held personally liable for allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action." *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)(quoting *Harlow*, 457 U.S. at 819, 102 S.Ct. 2727); *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 950 (9th Cir.2003). "Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." *Hunter*, 502 U.S. at 227, 112 S.Ct. 534; *Bingham*, 341 F.3d at 950. After a defendant properly raises qualified immunity in his or her defense at the summary

ORDER -17

judgment stage, the burden is on the plaintiff to produce evidence sufficient to create a genuine issue of material fact whether defendant engaged in conduct alleged to have violated a clearly established right.

**2. Plaintiff's claims for Unlawful Search and Seizure**

Defendants seek summary judgment on plaintiff's claims (# 92) for unlawful search and seizure and state law claims false arrest/false imprisonment (see below). Plaintiff claims the city police officers did not have valid authority to search for or pursue the Altima outside the city limits and to arrest him in Spokane County. Interestingly, the circuits have split on the issue of whether an arresting officer's lack of authority under state or federal law to conduct an otherwise constitutionally valid arrest constitutes an unreasonable seizure under the Fourth Amendment. *See Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir.2004)(citing cases). However, the Ninth Circuit has recently reaffirmed its position that the constitutionality of a seizure does not depend on an officer's authority under local law, rather Fourth Amendment standards require only reasonable suspicion in the context of investigative traffic stops (or probable cause in the instance of arrests). *U.S. v. Becerra-Garcia,* 397 F.3d 1167, 1174 (9th Cir. 2005)(citing *Haynie v. County of Los Angeles*, 339 F.3d 1071, 1075 (9th Cir.2003)). Though reasonableness cannot be reduced to per se rules, the Court remarked that it can not be said that a stop that exceeds an officer's (jurisdictional) authority is automatically unreasonable. *Id*.

The vitality whether plaintiff's §1983 claim for unlawful arrest does not depend on whether plaintiff actually was the previous driver of the Nissan Altima which had eluded police. Based upon the undisputed facts of this case as explained above, the police had both reasonable

ORDER –18

suspicion to stop the driver of the Nissan Altima, and probable cause to arrest its driver having suspected the driver had previously recklessly sped through Spokane eluding police and causing an accident. *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 2632, 61 L.Ed.2d 343 (1979). Plaintiff has not shown that the officers violated a clearly established right in arresting plaintiff and he cannot demonstrate that no reasonable officer could have believed that arresting plaintiff, under the circumstances, was lawful. Defendants are entitled to summary judgment on Plaintiffs' unlawful search and unlawful seizure claim.

**3. Excessive Force**

Defendants also seek dismissal of plaintiff's claims of excessive force upon both their merits and qualified immunity. Under either analysis, the Court must first determine, whether the facts alleged show the officers' conduct violated a constitutional right. *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. Where the facts are disputed, their resolution and determinations of credibility "are manifestly the province of the jury." *Santos v. Gates*, 287 F.3d 846, 852 (9th Cir. 2002).

The right to be free from excessive force is violated only if the force employed is objectively unreasonable. *See Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Graham v. Conner*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Reasonableness is judged "from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight...." *Graham*, 490 U.S. at 396. In applying the objective reasonableness analysis the Court must assess the gravity of the particular intrusion on Fourth Amendment interests by evaluating the type and amount of force

ORDER -19

inflicted. *Chew*, 27 F.3d at 1440. Second, the Court should also assess the importance of the government interests at stake by evaluating: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. See *Graham*, 490 U.S. at 396, 109 S.Ct. 1865 (internal quotations omitted).    The Court's inquiry is not, however, limited to those factors "[b]ecause the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Id*.    The reasonableness of a seizure must instead be assessed by carefully considering the objective facts and circumstances that confronted the arresting officers. *Id*. In some cases, for example, the availability of alternative methods of capturing or subduing a suspect may be a factor to consider. *See Chew v. Gates*, 27 F.3d 1432, 1441 n. 5 (9th Cir. 1994).

Finally, the Court's analysis must balance the "nature and quality of the intrusion" on a person's liberty with the "countervailing governmental interests at stake" to determine whether the use of force was objectively reasonable under the circumstances. *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. As the Supreme Court has noted, "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." *Id*. at 396-97.

First the Court looks to the quantum of force used to arrest plaintiff.  Officers Lesser and Vigessa utilized PIT maneuver to spin the vehicle driven by the plaintiff to a stop and then box him in.  The

ORDER -20

commanding of a police dog to apprehend a subject and the use of pepper spray, all of which the defendants also acknowledged they employed, are significant acts intended to assure compliance.   In addition, defendant Reynolds admits having attempted to deliver three "knee strikes" to plaintiff's rib area, placing his knee across the upper party of his body and attempting a Lateral Neck Restraint to control Skylstad.   Of course, on plaintiff's account the use of force of was even greater. He claims Officers Lesser and Vigessa punched him several times in the head, Officer Stanton beat him on the head and back with a flashlight, Officer Austin drove his knee into the back of his head, Sgt. McCabe punched him the head, his head hitting the windshield of the Nissan causing it to break.   Plaintiff also claims Officer Reynolds choked him while Sgt. McCabe then sprayed him with pepper spray.   It is finally alleged then that Reynolds, Longshore, Austin, Lesser, Vigessa, McCabe and Stanton tore off his clothes while he lay in the street. The alleged intrusion on plaintiff's Fourth Amendment interests was serious. However, as explained *infra*, the objective evidence does not corroborate these contentions and furthermore, plaintiff testified *while under oath* during his trial on the state charges resulting from his arrest, that at the time he was "really high."

Next it is necessary to apply the *Graham* criteria, beginning with the severity of plaintiff's crimes.   It is undisputed that plaintiff was driving an identical car as the one which just minutes beforehand had lead County and City police on several high speed chases through the streets of Spokane and Spokane County.   The reckless driver evaded capture having blown through stop signs and red lights, hit a bicyclist, and nearly caused several collisions while swerving into oncoming

ORDER –21

traffic.  The record supports the officers' objective reasonable belief that the driver of the Nissan Altima had already committed multiple crimes.  It is immaterial that plaintiff now claims he was not the driver of the car at that time.[6]  This factor strongly favors the defendants.

The Court also considers the threat plaintiff posed to the officers' safety.  According to Officer Lesser, he saw the plaintiff driving toward him at a high speed and weaving back and forth, and had to take evasive actions to avoid being struck.  Officers believed that the driver was now threatening them with the vehicle.  Plaintiff, however, denies having driven the vehicle in a threatening manner. After stopping the car utilizing a PIT maneuver, officers shouted at plaintiff to shut the car off, and plaintiff refused. Plaintiff denies having revved the engine or spun the tires as claimed by defendants, but undisputedly the officers felt the need to continue to maintain their pin, and to box the car in to prevent the driver from fleeing again, which resulted in damage to the patrol cars.  It then appeared to the officers from plaintiff's movement that he was searching for something in the vehicle. According to the Affidavit of Lt. Sprague, at this point, the suspect was considered an "active resister," and likely to become actively assaultive with his vehicle if not stopped.  Under these circumstances, given the ongoing course of behavior of the driver of this vehicle, the officers were entitled to assume that the driver posed

---

[6] Although according to plaintiff's version of the story, the officers perception of the threat turns out, in hindsight, was mistaken, the objective reasonableness of the officer's actions must be viewed from the "on-scene perspective." *Saucier*, 533 U.S. at 205, 121 S.Ct. 2151.

ORDER -22

an immediate and serious threat to their safety.  This factor weighs in the defendants' favor in light of the totality of the circumstances, though it is minimized by plaintiff's claim that he was not speeding erratically toward the officers.

The Court also considers whether Skylstad was actively resisting arrest or attempting to evade arrest by flight.  As analyzed above, it is undisputed the driver of the Nissan Altima had just minutes before police stopped Skylstad, twice evaded arrest by fleeing in his vehicle. Though Skylstad disputes actively resisting arrest, Skylstad ignored orders to turn off the engine, and at that point was viewed as an active resister.   Whether he continued to resist arrest is in dispute. Skylstad claims he did not resist.  Five affidavits of on scene and supervising officers, police reports of the incident, and EMT and medical notes all suggest Skysltad was violently struggling with the arresting officers.

Based on this record, the Court concludes that officers Lesser and Vigessa were reasonable under the circumstances in performing the PIT maneuver to stop the plaintiff and therefore the PIT maneuver itself did not constitute excessive force.    Furthermore, under the circumstances confronting the deputies, the use of the police dog was well suited to the task of safely arresting plaintiff, who the police reasonably believed was at risk of fleeing.  Officer Stanton knew that the trained police dog could be trusted to neutralize the situation, seize and hold the plaintiff, until the plaintiff could be restrained.  The dog's qualities, having been trained to perform the "bite and hold technique" were well suited for a felon, who was attempting or could attempt to once again evade capture.  In addition it was reasonably necessary to

ORDER –23

insert the dog into the car while ordering the bite and hold as police feared the plaintiff may have been attempting to recover a weapon. Permitting the dog to remain attached for less than a minute until the plaintiff was secured was also reasonable. Accordingly, the Court finds that in light of all the circumstances, the employment of the K-9 to apprehend the plaintiff did not constitute excessive force. In the alternative, the Court finds that a reasonable officer in the officers' position would not have known that using the PIT maneuver or employing the canine to apprehend the plaintiff violated any clearly established constitutional rights, so as to this particular conduct, the officers are entitled to qualified immunity. Qualified immunity operates to "protect officers from the sometimes 'hazy border between excessive and acceptable force." *Id.* at 206.

Thereafter, the parties offer varying accounts of what happened. By plaintiff's own self-serving account, he did not attempt to flee, he did not resist arrest, he was not a threat to officer safety, and he was attempting to surrender when the officers began assaulting him. Defendants, on the other hand, contend plaintiff violently resisted arrest thrashing around with extraordinary strength and that the undisputedly physical nature of the incident was all the result of plaintiff's illegal, uncooperative and prolonged resistance prior to being restrained by hand and leg restraints.

Reviewing plaintiff's own version of the arrest, it would appear to create some doubt as to whether the use of force was reasonable. However, plaintiff's description of events proffered in support of his claim is, however, quite convoluted and, at points, directly contradictory. First there is no documentary or medical evidence to

ORDER -24

support there was more than one contact made by the police dog, though plaintiff claims he was bit "several times." All of the medical testimony and documentary evidence indicates there was one laceration, consistent with a single contact with plaintiff's right forearm. This is also consistent with the handler's version that the dog performed a "bite and hold" and did not release throughout the struggle until commanded to do so. Other bruises, abrasions and "mini-cuts" were also noted on plaintiff's back, chest, and forehead, consistent with the undisputedly physical nature of the confrontation leading to his arrest. There is also no medical documentation which would substantiate plaintiff's allegation of his having been choked or having been struck in the head with a flashlight or having his head "slammed" into a windshield. Finally, the Court notes that it is undisputed that at the time plaintiff was apprehended he admittedly had recently used methamphetamine. During his trial for charges made after his arrest, Skylstad testified to being "really high" on September 19, 2001. Toxicology tests later confirmed significant levels of methamphetamine in his blood. EMT's on the scene of his arrest noted the plaintiff was uncooperative to questioning and somewhat confused.

It is apparent that the type of conduct alleged by plaintiff would have resulted in far greater injuries than those which he indisputably sustained. The objective factors of the plaintiff's medical records show no evidence of any injuries consistent with plaintiff's allegations. In this case, the injuries shown in the medical record are consistent with the admitted use of force, although not with the full quantum of force alleged by the plaintiff. Other inconsistencies permeate throughout plaintiff's version of the arrest.

ORDER -25

This Court fully recognizes credibility determinations and weighing of the evidence are solely functions for the factfinder, *Id.*, and that inferences drawn from underlying facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, there may be no *genuine* issue of material fact if "the evidence is of insufficient caliber or quantity to allow a rational finder of fact" to find for the nonmoving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 254 (1986). Taken as a whole, no rational trier of fact could find for plaintiff against any of these defendants on the merits of his radically differing and contradictory allegations surrounding the claimed use of excessive force in restraining the plaintiff during his arrest. *See Matsushita*, 475 U.S. at 586-87, 106 S.Ct. 1348. The mere existence of the scintilla of evidence plaintiff proffers is insufficient to find there is evidence upon which a jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 252. In light of the failure of plaintiff's claim on the merits, the Court need not address the defendants' assertion of qualified immunity.

### 3. Municipal Liability

In addition to suing the named individual City employees, plaintiff has sued the City "for the tortuous conduct of its employees." Municipalities are "persons" subject to suit under 42 U.S.C. § 1983. See *Monell v. New York City Dept. of Social Serv.*, 436 U.S. 658, 691 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). However, municipalities cannot be held liable pursuant to §1983 under a traditional respondeat superior theory. Rather, they may be held liable only when "action pursuant to official municipal policy of some nature caused a constitutional tort."

ORDER -26

*Id*. at 691, 98 S.Ct. 2018. Plaintiff's has not alleged and has not argued any such claim against the City.  Thus the City may not be held liable here under § 1983.

**B. STATE LAW CLAIMS**

Defendants also seek summary judgment both on the merits of plaintiff's state law claims, as well as on the grounds of qualified immunity.  State law qualified immunity rests on a different analysis than does qualified immunity under § 1983.  An officer enjoys qualified immunity when (1) carrying out a statutory duty, (2) according to procedures dictated by statute and superiors, and (3) acts reasonably. *Guffey v. State*, 103 Wn.2d 144, 152, 690 P.2d 1163 (1984), *overruled on other grounds*, *Babcock v. State*, 116 Wash.2d 596, 620, 809 P.2d 143 (1991).

**1. False Arrest/False Imprisonment**

Plaintiff claims that his stop and arrest without proper jurisdictional authority constituted the torts of false arrest and/or false imprisonment. False arrest or false imprisonment is the unlawful violation of a person's right of liberty or the restraint of that person without legal authority. *Bender v. City of Seattle*, 99 Wn.2d 582, 590-91, 664 P.2d 492 (1983).  R.C.W. 10.31.100 provides that a warrantless arrest is lawful when a police officer has "probable cause to believe that a person has committed or is committing a felony." The existence of probable cause to arrest is a complete defense to an action for false arrest and false imprisonment.  Probable cause for warrantless arrests exists when an officer has reasonably trustworthy information sufficient to permit a person of reasonable caution to believe that an offense has been or is being committed. *Gurno v. Town of LaConner*, 65

ORDER -27

Wn.App. 218, 223, 828 P.2d 49, review denied, 119 Wn.2d 1019 (1992). It is a reasonableness test, considering the time, place, and circumstances, and the officer's special expertise in identifying criminal behavior.

The evidence conclusively establishes that the officers had reasonable suspicion to stop and probable cause to arrest the driver of the Nissan Altima, and therefore the court need not submit this issue to a jury and can make a determination as a matter of law.  Though plaintiff challenges the officer's authority, plaintiff does not contend the officers did not have a reason to stop the Altima or to arrest him. It is undisputed that the city police officers were attempting to stop a reckless, fleeing driver.  Officers had reason to believe the driver of the vehicle had committed the state law offenses of eluding police and reckless driving.  In addition, the fact that the City police officers  followed, searched for, stopped, and arrested plaintiff outside the city limits is of no consequence under the facts of this case.  Police officers are allowed to enforce traffic laws throughout the 'territorial bounds of the state,' RCW 10.93.070, provided the officer is in 'fresh pursuit' as defined by RCW 10.93.120(2):

> The term 'fresh pursuit,' as used in this chapter, includes, without limitation, fresh pursuit as defined by the common law. Fresh pursuit does not necessarily imply immediate pursuit, but pursuit without unreasonable delay.

Under the statute, "courts are not limited by the common law definition, but may consider the Legislature's overall intent to use practical considerations in deciding whether a particular arrest across jurisdictional lines was reasonable." *City of Tacoma v. Durham*, 95 Wn.App. 876, 881, 978 P.2d 514 (1999)(where police observed driver

ORDER -28

weaving and running a red light, out-of-jurisdiction arrest after
pursuit was lawful). The police officers in this case had a reasonable
belief that the driver of the Altima posed a serious public danger.
Accordingly, defendants pursuit and arrest of the plaintiff was lawful.
Even if plaintiff were able to establish the officers were acting
without legal authority, the Court finds the officers are entitled to
state law qualified immunity as all three requirements are clearly met:
First police in general act under statutory authority to enforce the
state criminal laws. See RCW 10.93.070. Second, the defendants argue
that the officers acted in accordance with department procedures.
Finally, the officers acted reasonably in stopping the Altima because it
was the same vehicle which had previously eluded police driving at high
speeds in a very reckless and hazardous manner.

    **2. Assault and Battery**

    Defendants also seek qualified immunity on plaintiff's claims that
the defendants committed the state law tort of assault and battery when
defendants Lesser and Vigessa performed the PIT maneuver to stop the
Altima, when defendants pepper sprayed him and when they allegedly tore
plaintiff's clothes off in the street, beat him and choked him.

    Under Washington law, battery is a "harmful or offensive contact
with a person, resulting from an act intended to cause the plaintiff or
a third person to suffer such a contact, or apprehension that such a
contact is imminent"; an assault is any such act that causes
apprehension of a battery. Prosser & Keeton on the Law of Torts sec. 9,
at 39, 43 (5th ed.1984)). State qualified immunity for assault and
battery is not available to an officer who uses excessive force. *Staats
v. Brown*, 139 Wash.2d 757, 991 P.2d 615, 627-28 (Wash. 2000).

ORDER –29

Viewing the facts in a light most favorable to plaintiff, the Court finds, that the three requirements for state law qualified immunity are met with regard to the PIT maneuver and the use of the K-9 in the present case, as no excessive force was used. As explained above, the officers acted reasonably under the circumstances.  Examined from the perspective of the officers at the scene, the outcome of the rapidly unfolding search was uncertain, and the officers were concerned not only for public safety, but their own safety.  Given the fact that the driver had just erratically eluded both the County and City police in high speed chases within the hour beforehand, the performance of the PIT maneuver to box in the vehicle was a reasonable response, even if as alleged by the plaintiff, the vehicle was stopped or slowing.  The whole purpose of the maneuver is to stop the vehicle *and to keep* the vehicle stopped.

In addition, from the perspective of the officer, the driver failed to shut off and exit the vehicle and made furtive movements once stopped which made them believe the driver could be searching for a weapon. Accordingly, assuming the driver could have been armed, the officers were forced to take extra precautions and the use of the K-9 was reasonable in order to apprehend the plaintiff, although the experience was no doubt frightening and painful for plaintiff.

As to plaintiff's remaining excessive force allegations, the Court finds plaintiff has failed to ultimately persuade this Court in opposing summary judgment that he will have sufficient admissible evidence to justify going to trial.  Accordingly, the Court finds there is no genuine issue for trial. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249-250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)("[T]here is no issue

ORDER -30

for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."); *British Airways Board v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978)("A mere scintilla of evidence will not do, for a jury is permitted to draw only those inferences of which the evidence is reasonably susceptible; it may not resort to speculation."); see also *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ("[I]n the event the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free ... to grant summary judgment."); *Cal. Architectural Bldg. Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir.1987)).

## 3. Municipal Liability

Plaintiff's state law claims against the City of Spokane are based solely on the theory of respondeat superior.[7] Any claim of assault and battery could not be imputed to the City under the doctrine of respondeat superior because any such alleged tortuous act would have been clearly outside the scope of employment. Finally, because plaintiff cannot not establish a state law claim for false arrest because the officer's actions were reasonable and therefore authorized, plaintiff

---

[7] The City argues the immunities of the officers would shield the City from any tort liability, citing *Guffey v. State,* 103 Wn.2d 144, 152, 690 P.2d 1163 (1984).  However, *Guffey* has been impliedly overruled by *Savage v. State,* 127 Wash.2d 434, 438, 447, 899 P.2d 1270 (1995), which held that the government employer did not share its employee's qualified immunity even when liability was based solely on a theory of respondeat superior.

ORDER -31

has no claim against the City based upon *respondeat superior*. Accordingly, the City is also entitled to summary judgment regarding plaintiff's state law claims.

**IV. CONCLUSION**

Based upon the reasoning and citations to authority set forth above,

**IT IS HEREBY ORDERED THAT:**

1. The Spokane City Defendants' Motion for Summary Judgment (Ct. Rec. 93) is **GRANTED.**

2. Plaintiff's Cross-Motion for Summary Judgment (Ct. Rec. 165) is **DENIED.**

3. Each of the causes of action alleged by plaintiff against defendants the City of Spokane, Jason Reynolds, Thomas Stanton, Dave McCabe, Kurt Vigesaa, Dan Lesser, Brent Austin and Lynette Longshore are hereby **DISMISSED WITH PREJUDICE;**

4. The Court's granting summary judgment has concluded the litigation in this case between the plaintiff and the above named defendants. Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure there is no just reason for delay and **JUDGMENT** shall be entered against plaintiff and in their favor.

5. The District Court Executive is directed to enter this Order, enter **Judgment** in favor of the above named defendants**,** forward copies to the parties, and **CLOSE THE FILE.** The District Court executive is directed to enter this order and provide copies to the parties.

**DATED** this___7th___day of June, 2005.

*s/Lonny R. Suko*
LONNY R. SUKO
UNITED STATES DISTRICT JUDGE

ORDER -32